Filed 2/16/22  In re L.C. CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re L.C. et al., Persons Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY, | F083233 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 20JD0149, 20JD0150) |
| v. | **OPINION** |
| HEATHER S. et al., | |
| Defendants and Appellants. | |

### THE COURT[*]

APPEAL from orders of the Superior Court of Kings County.  Jennifer Lee Giuliani, Judge.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant, Heather S.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant, Alex C.

---

[*]     Before Meehan, Acting P. J., Snauffer, J. and DeSantos, J.

Diane Freeman, County Counsel, and Risé A. Donlon and Thomas Y. Lin, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Heather S. (mother) and Alex C. (father) (collectively, the parents) appeal the juvenile court's order terminating parental rights to their now three-year-old son, L.C., and two-year-old daughter, C.C. (the children), and selecting adoption as their permanent plan (Welf. & Inst. Code, § 366.26).[1] Mother contends the juvenile court erred by declining to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). Father, joined by mother, contends remand is required because the juvenile court failed to correctly apply our Supreme Court's recent decision of *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 20, 2020, the Kings County Human Services Agency (Agency) received a referral alleging the hotel room where mother, father and the children were living was in a deplorable condition. A social worker investigating the referral confirmed that was the condition of the room and after explaining the concerns about the home, mother and father agreed to participate in a safety plan.

The family was familiar to the Agency because of a prior dependency case involving L.C., who was detained from his parent in July 2018, when he was three months old, after they were arrested for being in possession of and under the influence of methamphetamine. Dependency jurisdiction was taken over L.C. and family maintenance services ordered for mother and reunification services for father. Father's services were terminated in March 2019. The juvenile court terminated dependency jurisdiction in September 2019 and awarded sole physical custody to mother.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

After the Agency received reports that L.C. was not being supervised, a child family team meeting was held on August 24, 2020. Mother denied drug use, while father admitted occasional marijuana use; both said they were willing to drug test for the Agency. Two days later, a woman contacted the Agency and reported C.C. had been in her care since August 7, 2020. The woman was concerned because mother did not check on C.C. often and the woman did not realize C.C. would be left with her for an extended period. Mother and father submitted to a urine substance analysis—mother tested positive for amphetamine and while father tested negative, the test showed a trace amount of amphetamine.

### *The Dependency Petition*

Due to the parent's denial of substance use, the numerous reports of the children being unsupervised, and the home's unsafe condition, the Agency obtained a protective custody warrant on September 2, 2020, and took the children into protective custody. The Agency filed a petition alleging the children, who were then two years old and 14 months old, came within the provisions of section 300, subdivision (b)(1) based on mother's inability to provide appropriate care due to her use of illicit substances and father's failure to protect the children from mother. The juvenile court ordered the children removed from parental custody at the September 4, 2020 detention hearing.

The Agency subsequently filed a first amended petition that incorporated recent drug test results that showed mother tested positive for amphetamine and methamphetamine, while father tested positive for methamphetamine. The first amended petition also added a section 300, subdivision (j) allegation that L.C. was detained from father under section 300, subdivision (b) and there was a substantial risk C.C. would be similarly neglected as father had not ameliorated the problems that led to L.C.'s removal.

### *The Jurisdiction/Disposition Hearing*

In its report for the jurisdiction/disposition hearing, the Agency recommended the juvenile court find the first amended petition true, the children remain in out-of-home

3.

care, and the parents be offered reunification services. The parents received referrals for mental health and alcohol and drug assessments.

The parents had two visits with the children. They were late for the first visit. Mother brought the children clothes, shoes, and toys. C.C. appeared happy to see her parents and ran to mother. L.C., who had been calm while waiting for his parents to arrive, started throwing tantrums and crying. Mother kneeled at eye level and explained to him, while he was having a tantrum, that hitting and throwing things at others and on the floor was not okay, but L.C. did not appear to care. Father did not discipline him. The parents arrived on time for the second visit and brought gifts. L.C. appeared excited to see them and ran to greet them. The parents hugged and kissed the children and interacted with them in the play area. Mother disciplined L.C. after he pinched, hit, and pulled her hair while changing his diaper. The visit ended well.

A combined contested jurisdiction/disposition hearing was set for October 8, 2020. Both parents were present with counsel at that hearing. They withdrew their contests and submitted on the petition based on the Agency's reports. The juvenile court found the first amended petition's allegations true, adjudged the children dependents, removed them from parental custody, and ordered family reunification services. The juvenile court ordered supervised visits in accordance with the court-ordered case plan and gave the Agency discretion to liberalize them.

***The Six-Month Review Hearing***

In a report prepared for the six-month review hearing, the Agency recommended termination of mother's and father's reunification services and the setting of a selection and implementation hearing under section 366.26. The report contained a review of the parents' noncompliance with components of their case plans, particularly regarding substance abuse services, drug testing, and housing, although mother complied with the mental health services component of her case plan.

4.

The parents struggled to arrive on time for visits and missed multiple visits due to being late. While the Agency and the children's care providers arranged for frequent Zoom visitation with the children, the visits were discontinued because the parents did not make themselves available. The care providers continued to report L.C.'s behavior regressed following visits; he would throw tantrums, bite, and bang his head. The tantrums, however, became less intense with time and the care providers were working with L.C. to ensure the transition after visits was smooth.

A child family team meeting was held on February 8, 2021, to discuss the parents' concerns they were getting fewer visits since mother's relative started supervising them. The relative, however, stated the parents were constantly 30 to 45 minutes late to visits. The parents were reminded visits were cancelled if they arrived 15 minutes late. During supervised visits at the Agency, the parents were observed to interact with the children, although they overwhelmed the children with toys, clothes, and candy. L.C. had frequent tantrums during visits, but mother appeared to be attentive to him and would ignore him until he calmed down.

At the April 5, 2021 six-month review hearing, both parents requested a contested hearing. County counsel asked that mother submit to a hair follicle test before the next hearing, which her attorney was in favor of to show her sobriety. A contested hearing was set for 10:00 a.m. on April 26, 2021.

The Agency filed an addendum report, which noted that mother initially failed to drug test, but she and father later submitted random hair follicle and urine tests. Both urine tests were negative, although mother's showed traces of amphetamine and phencyclidine. The hair follicle test results had not yet been received. The social worker attempted to contact the parents to arrange visitation on each of the three days after the hearing but was unable to reach them via phone or text message, so a visit did not occur that week. Visits, however, did occur on April 14 and 19, 2021. The parents were five

minutes late to the visits, but they were attentive to the children when they arrived. They played with and read to the children and encouraged L.C. to use his words.

The parents were not present when the April 26, 2021 contested hearing commenced. All counsel were prepared to proceed. County counsel reported mother sent a text message to the social worker at 10:00 a.m. stating why she was late but she was "almost there." Mother's attorney stated he would proceed with argument if mother did not arrive, while father's counsel asked the juvenile court to wait a few minutes to see if mother appeared. The juvenile court declined the request and all counsel provided argument. The juvenile court adopted the recommended findings and orders, terminated mother's reunification services, and set the section 366.26 hearing for August 2021.[2]

### The Section 366.26 Hearing

The Agency filed a report for the section 366.26 hearing on August 4, 2021, in which it recommended termination of parental rights and a permanent plan of adoption for the children. The Agency opined the children were adoptable based on their ages, lack of significant bond to their parents, and lack of any significant developmental delays or concerns about their physical or mental health. The children were described as "happy, active, healthy, and adorable toddlers." While L.C. had been a client of the Central Valley Regional Center (CVRC), where he was receiving early start intervention services, he graduated from the program when he turned three as he met his treatment goals. There was pending a school assessment to receive ongoing support and services to address L.C.'s speech. C.C. did not have any significant developmental delays, mental

---

[2]     Mother's attorney filed a notice of appeal on mother's behalf from the April 2021 findings and orders terminating mother's services and setting the section 366.26 hearing. We subsequently granted mother's unopposed motion to treat the notice of appeal as a writ pursuant to section 366.26. In an unpublished opinion, we denied the petition. (*Heather S. v. Superior Court* (July 27, 2021) F082756.) Father did not file a writ petition.

health, or medical concerns. An assessment with CVRC was scheduled to address concerns with her speech, as she struggled to pronounce words.

The children had been in two placements since being removed from their parents—the first placement ended following the death of one of the care providers. The care providers at the second placement reported that upon receiving the children into their care in December 2020, the children displayed tantrum behaviors several times a day— they bit themselves, threw themselves on the floor, and banged their heads on the ground if they did not get their way. The care providers were able to redirect the children's behaviors, which had improved since March 2021. With the recent change in visits, the care providers reported L.C. had regressed into his old behaviors and asked for counseling services to address them. L.C. was pending an assessment at the time of the report. The care providers reported no social, emotional, or behavioral concerns for C.C. The care providers, who were non-related extended family members, stated they loved the children and cared about them, and they were open to adoption should parental rights be terminated.

The report contained a review of the parents' visitation history. From September 21, 2020, through November 30, 2020, the parents had weekly visits with the children for up to two hours which were supervised at the Agency. The parents would bring food, snacks, drinks, and activities for the children. The parents were attentive and interactive with the children. During some visits, L.C. would hit, pinch, and bite the parents when they changed his diaper, and once L.C. slapped mother's face when she changed him. Mother put L.C. in time out and told him he needed to behave even though he was out of their care. The parents were appropriate with the children. At the end of visits, L.C. would sometimes get fussy and cry briefly while being buckled into his car seat. The children fell asleep, however, when they were transported.

From December 2020 to February 2021, the Agency transitioned to visits being arranged and supervised by mother's relative. The visits, however, transitioned back to

the Agency due to concerns about the parents not visiting consistently and cancelling visits at the last minute. The parents had a two-hour supervised visit at the Agency in March 2021. In April 2021, visits transitioned to once a month for one hour. The parents had a one-hour supervised visit at the Agency in May 2021; the parents were appropriate, and no concerns were noted at that visit.

The social worker supervised a two-hour visit at the Agency in June 2021. The parents, who arrived on time, greeted the children with hugs and kisses. They brought many activities, food, snacks, drinks, and an ice cream cake, and celebrated C.C.'s second birthday. The parents were attentive and interacted with the children as they played, rode a tricycle, flew a kite, and inflated balloons. At the end of the visit, the parents walked the children to their care provider; no concerns were noted.

After that visit, a visitation transition plan was developed with the parents that allowed them to receive supervised bi-weekly one-hour visits in June and July 2021, and one visit in August 2021. The parents had a second one-hour visit in June 2021, during which they were attentive, interactive, and affectionate with the children. At the end of the visit, the parents walked the children to their care provider, and gave the children hugs and kisses. No concerns were noted.

On July 4, 2021, the care provider supervised a one-hour visit at a local park. The parents arrived late due to car issues, but the care provider allowed the visit to continue as planned. The parents interacted appropriately with the children. The care provider noted L.C. had difficulty following his parents' directions and did not want them to buckle him into his car seat at the end of the visit. Otherwise, there were no concerns. A one-hour visit was scheduled for July 26, 2021, at the Agency.

According to the Agency, the children appeared to be comfortable and well cared for in their current placement. The social worker observed that they were well bonded and attached to their care providers, as the children sought attention, affection, and comfort from them, and they were content and happy. Although prospective adoptive

8.

parents had not been identified for the children, the paternal grandparents, who lived in Louisiana, had requested placement and an Interstate Compact for the Placement of Children assessment was pending, and the care providers were willing to provide a plan of adoption. The Agency believed it was in the children's best interest to provide permanency and stability through the permanent plan of adoption and it would not be detrimental to them if parental rights were terminated, as they had limited contact with their parents. The Agency noted that while two families were interested in providing permanency, adoption services was confident an adoptive home could be easily located if they were unable to adopt.

A contested section 366.26 hearing was held on August 24. At the contested hearing, the juvenile court took the reports and their attachments into evidence and the juvenile court accepted the parties' stipulation the children were adoptable.

The Agency called mother to testify. She testified about the frequency and duration of the parents' visits with the children. Mother disagreed with the Agency's recommendation to free the children for adoption because she felt it would be hard on the children to not be around their parents since they were together with the children "24/7 since they were born," at least until the children were removed from their care. Mother's belief was based on the children's reactions during visits. The children ran up to them at the start of visits, and when visits ended, L.C. became upset and had "meltdowns." A couple times at the end of visits, L.C. climbed into her vehicle and sat down, and she had to physically remove him and force him into the care providers' car seats. Mother testified transitions at the end of visits had been hard, with C.C. displaying the same behaviors, though she believed C.C. was feeding off her brother. Mother disagreed with the Agency's reports concerning her compliance with services. Mother had asked for third-party supervision of visits to end due to misstatements by the third-party supervisor.

On examination by her attorney, mother stated she was L.C.'s primary care provider, with assistance from father, until L.C. was detained, and she and father were

C.C.'s care providers from her birth until her detention. She provided for L.C.'s needs and when he was detained, she had been attempting to enroll him in services for his behavior and communication issues. She did everything with the children and had a bond with them. Mother interacted with the children at visits, including painting, coloring, drawing, and riding bicycles, and she celebrated L.C.'s birthday at a five-hour visit in April. Mother testified the children were "[e]cstatic" to see their parents at every visit, but "[i]t was hard" when visits ended, as the children would have meltdowns and temper tantrums, and L.C. did not want to assist in cleaning up because "he did not want the visit to end." According to mother, L.C. had trouble communicating with people other than her, they were able to get him to start speaking more with father, and L.C. communicated affection toward her by saying "love, hug, kiss," and he called her "Mama." Mother concluded her testimony by stating L.C.'s language regressed in difficult situations or transitions.

At the conclusion of mother's testimony, the Agency rested, and father's attorney called father to testify. Father stated L.C. was in his and mother's care for L.C.'s first three months, when he was removed from their custody. After a month, mother regained custody of L.C. and father visited him weekly at the Agency until the case closed. Thereafter he continued to visit as arranged by mother. During visits, father played with his son, who called him "Dada." L.C. expressed affection toward father by giving him hugs and kisses, and at every visit he told father he loved him. Father agreed with mother's testimony concerning the children's behavior at the end of visits and added C.C. was carried off screaming at the end of more than one visit.

Father helped care for his son, including changing his diaper, feeding him, and teaching him things. Father lived with C.C. for "a little less than a year" before the children were removed, during which time he played, blew bubbles, and colored with her. C.C. called him "Dada," expressed affection toward him, and told him she loved him. The children ran up to their parents at each visit and at the end of visits, L.C. acted out

while C.C. appeared sad. Father believed the children were bonded to him as a parent. Father did not believe L.C. had any learning disabilities. Rather, he was selective in what he was willing to do in front of other people, especially people he did not know.

The matter proceeded to argument. County counsel, in arguing the parents failed to satisfy their burden of proving the beneficial parent-child relationship exception, explained in the most recent decision regarding the exception, *Caden C.*, the Supreme Court stated the parents had the burden to prove three things: (1) regular visitation and contact; (2) the relationship is a parental relationship and the continuation of that relationship would benefit the children such that the termination of parental rights would be detrimental to the children; and (3) whether it is in the children's best interest to maintain the relationship as opposed to terminating parental rights and freeing the children for adoption for the purpose of providing them with stability and permanency.

County counsel conceded there had been regular visitation and contact but argued the evidence did not establish "a parental relationship between the parents and their children." County counsel asserted while the parents described the visits as pleasant and they engaged in those visits and acted appropriately with the children, the children, who were two and three, had been out of their parents' care for a substantial portion of their lives, and someone else had been providing the day-to-day parenting. Instead, the parents "maintained a friendly visitor relationship with these children." County counsel further argued the focus was on the children's best interests "from their perspective" and the evidence did not establish a "parental relationship," and even if the evidence established a parental relationship, there was no showing of detriment in terminating that relationship. County counsel asked the juvenile court to follow the Agency's recommendation and terminate parental rights and free the children for adoption. The children's attorney agreed with county counsel.

Father's attorney agreed with county counsel's statement of the law and the standards the court had to apply but argued the evidence established father had a

11.

parent/child relationship with the children, as the children called him "dada," they were comfortable in his care and control during visits, he provided care for L.C. when L.C. was in his care, and the children were upset when visits ended. Mother's attorney argued a parent/child relationship existed because the children had a relationship with mother their whole lives, she cared for and nurtured them, and during visits the children were happy to see their parents and called them mother and dada. Mother's attorney further argued it would be detrimental to the children to break their relationship with mother and the children would benefit from continuing it. Mother's attorney asked the court not to terminate parental rights and find there was a beneficial parent/child relationship which was a "positive and significant relationship."

Following argument, the juvenile court took the matter under submission and returned after a break to deliver its decision. The juvenile stated that county counsel "correctly stated the law," which provided it was the Agency's burden to establish by clear and convincing evidence the children were adoptable. The juvenile court found such evidence existed and the Agency established the children were adoptable based on the parties' stipulation and the information in the Agency's report.

Turning to the beneficial parent-child relationship exception, the juvenile court listed the three determinations it needed to make and explained it was the parents' burden to establish, first, as county counsel "correctly stated," the parents had regular visitation and contact, which the juvenile court found was clearly present. The juvenile court next found the parents did not meet their burden of establishing they had a parent/child relationship with the children and there was insufficient evidence the children had a bond with the parents that would satisfy the requirements and standard set forth in the case law. Finally, the juvenile court found that even if it believed a bond existed, the parents failed to show the bond was "so strong and beneficial to the children that it outweighs the benefit to the children to have a stable and adoptive home." The juvenile court followed

12.

the Agency's recommendation, terminated mother's and father's parental rights, and ordered a permanent plan of adoption.

## DISCUSSION

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)

To establish the beneficial parent-child relationship exception the parent must show by a preponderance of the evidence three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 636.) In assessing whether termination would be detrimental, the juvenile court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at pp. 631–632.) When the parent meets this burden, the exception applies such that it would not be in the child's best interest to terminate parental rights and the court selects a permanent plan other than adoption. (*Id.* at pp. 636–637.)

The first element of the exception asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid.*)

13.

The second element asks "whether 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, at p. 632.) "[T]he parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Id.* at p. 636.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court is guided by the child's best interest in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*) " 'If severing the natural parent/child relationship would deprive the child a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id.* at p. 634.)

We review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id.* at pp. 639–640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even when substantial evidence to the contrary also exists. (*Id.* at p. 640.) The juvenile court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion. (*Ibid.*) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

### *The Beneficial Relationship Element*

In the present case, it is undisputed the parents met the first prong of the analysis—whether they had regular visitation and contact with the children. The disputed question is whether the parents demonstrated the children have a "substantial, positive emotional attachment" to them such that they would benefit from continuing the relationship. Mother contends she met her burden of establishing this element, while both parents contend the juvenile court erred in relying on factors held improper in *Caden C.* Specifically, they challenge the court's findings they did not have a parent/child relationship with the children and there was insufficient evidence the children had a "bond" with their parents.

In its ruling, the juvenile court correctly stated the elements of the beneficial parent-child relationship exception.[3] After finding the parents had regular visitation and

---

[3] The juvenile court stated the exception applies when "termination would be detrimental to the child because the parents have maintained regular visitation and contact with the child or children and that the child or children would benefit from continuing the relationship with their parents" and the court must "balance the strength

15.

contact with the children, the juvenile court stated the parents had the burden of proving a "parent/child relationship." The juvenile court explained that such a relationship existed up until the children's detention, and while there was "seemingly some relationship that is ongoing," the issue was not whether the parents are bonded to the children but whether the children are bonded to the parents. The juvenile court found while there was evidence mother believed she was bonded to the children and father believed the children were bonded to him, and counsel argued there was a bond, it did not "have evidence of that bond that would satisfy the requirements of the court cases that have been ruled upon by the appellate and Supreme [C]ourt and would meet the requirements and the standard set forth in those cases." The juvenile court further found that even if such a bond existed, it had to weigh that bond against the benefit of adoption, and while the evidence suggested "these parents love their children very very much and that they will certainly be unhappy" if parental rights were terminated, it could not find the parents "met their burden to show that the bond between" them and the children was "so strong and beneficial to the children that it outweighs the benefit to the children to have a stable and adoptive home."

The parents argue the juvenile court applied the wrong standard when deciding the second element because it believed it needed to find a "strong and beneficial bond" rather than a "substantial, positive, emotional attachment." The parents further argue the juvenile court accepted factors deemed irrelevant by *Caden C.* and *In re J.D.* (2021) 70 Cal.App.5th 833, because the juvenile court stated it agreed that county counsel correctly stated the law in closing argument, and county counsel argued the parents failed to show they had a "parental relationship" with the children and instead the evidence showed the parents had a "friendly visitor relationship."

and quality of the parent/child relationship in a tenuous placement against the security and sense of belonging that a stable family would give the child or children."

16.

With respect to the use of the word "bond," there is nothing in *Caden C.* that prohibits considering a child's bond to a parent when determining whether the child would benefit from continuing the relationship. Indeed, the Supreme Court noted a bonding study or expert testimony may be "an important source of information about the psychological importance of the relationship for the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 632–633 & fn. 4; see *In re J.D.*, *supra*, 70 Cal.App.5th at p. 862 ["objective, third party evidence of the parental bond" may be sufficient to establish the exception in an appropriate case].) The juvenile court here certainly understood the focus of its inquiry was on the children and their relationship with their parents, and that it was required to determine whether the children would benefit from continuing that relationship. Viewed in context, the juvenile court properly focused on the nature of the relationship between the children and their parents and found that it was not a substantial one.

With respect to the juvenile court's finding concerning a parent/child relationship, the court in *In re J.D.*, *supra*, 70 Cal.App.5th at pages 864–865, in addressing a trial court's finding that the mother did not have a "parental bond" with the child, noted *Caden C.* did not address whether, to satisfy the second element, the nature of a party's relationship must be "parental," and stated, that descriptor, "standing alone, is vague and unhelpful in this context." (*In re J.D.*, at p. 864.) The appellate court further stated: "*Caden C.* said only that the child must have a 'substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.' [Citations.] Such a relationship is surely more significant than that of a 'mere friend or playmate.' " (*Ibid*.)

Explaining the Supreme Court made clear more than one person can occupy an important, emotional role for a child even if the nonreunifying parent is incapable of providing for the child's everyday needs and well-being, and "the type of relationship necessary to establish the exception is not narrowly defined or specifically identifiable, because parent-child relationships are endlessly varied," the appellate court could not be

certain the trial court's "determination that [the] mother did not occupy a 'parental' role encompassed factors that *Caden C.* deems irrelevant." (*In re J.D.*, *supra*, 70 Cal.App.5th at p. 865.) Accordingly, the appellate court concluded the trial court apparently applied the wrong legal standard in evaluating the second element, reversed the order terminating parental rights, and remanded the matter for the trial court to conduct a new section 366.26 hearing. (*Id.* at pp. 865, 870.)

In *In re D.M.* (2021) 71 Cal.App.5th 261, which the parents cite here, the appellate court held the trial court erred by equating a "parental role" with "attendance at [the children's] medical appointments, and understanding their medical needs," and saying nothing about the attachment between the father and his children. (*Id.* at p. 270.) The court explained "*Caden C.* made clear the beneficial relationship exception is *not* focused on a parent's ability to care for a child or some narrow view of what a parent-child relationship should look like. [Citation.] Instead, the focus is whether there is a substantial, positive emotional attachment between the parent and child." (*Ibid.*) The appellate court concluded the trial court's "express findings that father did not act like a parent demonstrate it considered factors which *Caden C.* has explained are inappropriate in determining whether the parental-benefit exception applies." (*Id.* at p. 271.)[4]

These cases do not hold that it is always improper to consider whether and to what extent a parent occupies a parental role in their child's life. Rather, the concern was the trial courts, in finding the parents did not occupy a parental role, were misapplying *Caden C.* or relying on considerations the Supreme Court deemed improper, such as comparing

---

[4] See *In re L.A.-O* (2021) 73 Cal.App.5th 197, 211–212 [when the trial court declined to apply the exception because the parents " 'ha[d] not acted in a parental role in a long time' " while the prospective adoptive parents had, it was not clear whether the court meant "the children had a substantial, positive, emotional attachment to the prospective adoptive parents but not to the parents," which would be legally correct, or the parents were incapable "of taking custody, or had not been good parents, or had not been providing necessary parental care," which would be erroneous].)

the parent's attributes as a custodial caregiver to those of a potential adoptive parent or using a parent's struggles with issues that led to the dependency as a bar to applying the exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 634, 638.)

Here, contrary to the parents' assertion, there is nothing in the record to indicate the juvenile court relied on improper factors when considering whether the parents met their burden of proving the second element—whether the children would benefit from continuing their relationship with their parents. Although the juvenile court was terse in its explanation, it considered the emotional connection between the children and the parents, including that they were excited to see their parents and sad when visits ended, and determined that relationship was not significant enough to support a finding the children had a bond with their parents, meaning they were not significantly attached to their parents. Contrary to the parents' assertions, the juvenile court did not compare the parents' attributes to those of the children's care providers, consider that the care providers were the ones who provided most of the children's care, or require that the children's primary bond be to the parents. Instead, it looked solely at the children's relationship with the parents and found it insufficient to establish the second element of the exception.

Given the juvenile court's findings, that the juvenile court asserted county counsel correctly stated the law does not mean it relied on impermissible factors. Moreover, county counsel's argument the parents were not more than friendly visitors is relevant to determining whether the children had substantial, positive emotional attachments to their parents, as the children's relationship with their parents must be "surely more significant than that of a 'mere friend or playmate.' " (*In re J.D.*, *supra*, 70 Cal.App.5th at pp. 864-865.) We note that " ' "[w]e must indulge in every presumption to uphold a judgment, and it is [appellant's] burden on appeal to affirmatively demonstrate error—it will not be presumed." ' " (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1161.) The parents have not demonstrated error, and it will not be presumed here.

19.

On this record, we cannot say the juvenile court was required to find the children had a substantial, positive emotional attachment to their parents as a matter of law. (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 647 ["[w]hen the juvenile court finds the parent has not … established the existence of the requisite beneficial relationship," we look to "whether the evidence compels a finding in favor of the parent on this issue as a matter of law"], disapproved on another ground by *Caden C.*, *supra*, 11 Cal.5th at p. 637, fn. 6; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

The children, who were two years old and 14 months old when they were removed from their parents, had been out of the parent's custody for nearly a year. During the first six months of services, the parents had weekly two-hour visits, which were reduced to one-hour monthly visits in April 2021. In June and July 2021, the parents received two visits per month. There was evidence the children had an emotional attachment to their parents, as they were excited to see them at the beginning of visits, the visits were pleasant, the parents interacted appropriately with them, and the children were affectionate with their parents and sad when visits ended. There was no evidence, however, that this emotional attachment was substantial, as the children's contact with their parents was extremely limited and there was nothing to suggest the children missed their parents when away from them or had difficulty adjusting to their absence.

Mother argues the juvenile court did not give due weight to the children's affection toward their parents and asserts their reactions show they wanted the visits to continue. However, considering the children's young ages, the period of separation from their parents, the brief and friendly supervised visits throughout the case, and the children's needs for permanency and stability as toddlers, there was certainly room for the juvenile court to determine that a beneficial relationship was lacking. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

***Balancing the Harms and Benefits***

Even if the juvenile court was influenced by misconceptions regarding whether there was a "parental relationship," and we accept that the parents established the second prong of the exception, the juvenile court acted well within its discretion when it found the children would not suffer detriment upon termination of the parent-child relationship. On this record, the juvenile court could not have reached a different conclusion in balancing the harm of losing the parental relationship against the benefits of placement in an adoptive home.

The parents presented no evidence that terminating the children's relationship with them "would be detrimental to the [children] even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) As we have stated, the children were two years old and 14 months old when they were removed from their parents' custody. While the parents had visited consistently and spent time playing with the children, and there was ample evidence they loved and felt a strong bond to the children, there was no evidence the children felt so connected to them that terminating the relationship would be harmful.

Mother asserts harm is apparent because there is no indication the children were ready to give up their relationship with their parents and the children's reactions to visits showed they wanted contact with their parents to continue. While the children enjoyed visiting their parents, there is no evidence their relationship with their parents was so significant it outweighed the security and stability of an adoptive home. Nothing in the record showed each child's relationship with either parent was "so important to the child that the security and stability of a new home wouldn't outweigh its loss," thereby establishing "termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.)

The parents argue the juvenile court applied an incorrect standard, and improper factors, because it stated it could not find "the bond … between the parents and the

21.

children is so strong and beneficial to the children that it outweighs the benefit to the children to have a stable and adoptive home," rather than weighing the "harm of severing the relationship" against the benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) We disagree, because in making this finding, the juvenile court essentially determined termination of the parent/child relationship was not detrimental, as the relationship was not so important to the children that the security and stability of a new home would outweigh its loss. (*Id.* at p. 634.)

Finally, noting the juvenile court stated it was "required to balance the strength and quality of the parent/child relationship in a tenuous placement against the security and sense of belonging that a stable family would give … the children," the parents assert the children's current placement with their care providers was not tenuous because they might have been amenable to legal guardianship. This argument, however, is speculative and ignores that a guardianship may be a tenuous placement as there is no guarantee the guardianship will continue throughout the children's minority. The children are very young and need permanency and stability in a safe and loving home.

In sum, the juvenile court's determination that the benefits of adoption outweighed any benefit to maintaining the parent-child relationship was not an abuse of discretion. Therefore, the juvenile court did not err in declining to apply the beneficial parent-child relationship exception, and its orders terminating father's and mother's parental rights were proper.

## **DISPOSITION**

The juvenile court's orders are affirmed.